EXHIBIT A

LEONARD CARDER, LLP
**Eleanor Morton** (SBN 220407)
emorton@leonardcarder.com
**Emily Maglio** (SBN 267190)
emaglio@leonardcarder.com
**Afroz Baig** (SBN 308324)
abaig@leonardcarder.com
1188 Franklin Street, Suite 201
San Francisco, CA 94109
Tel: (415) 771-6400
Fax: (415) 771-7010

*Attorneys for Proposed Amicus,*
INTERNATIONAL LONGSHORE
AND WAREHOUSE UNION

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EVAGELOS ANDRIKOS, et al. | Case No. 2:19-cv-10421 GW(JCx) |
| Plaintiffs, | **[PROPOSED] *AMICUS CURIAE* BRIEF OF THE INTERNATIONAL LONGSHORE AND WAREHOUSE UNION IN PARTIAL OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| v. | |
| PACIFIC MARITIME ASSOCIATION, et al. | |
| Defendants. | Date:     December 17, 2020<br>Time:     8:30 A.M.<br>Judge:   Hon. George H. Wu<br>Ctrm:    9D, 9th Floor |

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................. 1

II.     STATEMENT OF FACTS .................................................................... 3

        A.      ILWU and the Longshore/Clerk Agreement ........................... 3

        B.      ILWU's Historic Struggle for Administration of the
                Longshore and Marine Clerk Dispatch Halls ......................... 4

        C.      Adversity Between ILWU and the PMA Employers
                Regarding the Dispatch Halls ................................................. 6

        D.      Current Administration of the Dispatch Halls ....................... 9

        E.      Transportation Worker Identification Credential ................ 10

III.    ARGUMENT ..................................................................................... 11

        A.      Plaintiffs are Inadequate Representatives Whose Interests
                Strongly Conflict with the Workers They Aspire to Represent
                for the Reporting Time, Pre-Shift Time, and Mileage
                Reimbursement Subclasses. ................................................. 12

        B.      Plaintiffs are Inadequate Representatives Whose Interests
                Strongly Conflict with the Workers They Aspire to
                Represent for TWIC Card Expense Claim ........................... 15

        C.      Denial of Class Certification is Supported by *Levias* Litigation ........ 16

IV.     CONCLUSION .................................................................................. 18

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TEL: (415) 771-6400 FAX: (415) 771-7010

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Allen v. Labor Ready Southwest, Inc., CV 09-04266 DDP (AGRx)*,
    2010 WL 11509051 (C.D. Cal. Dec. 2, 2010) ...................................................17

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
    568 U.S. 455, 133 S.Ct. 1184 (2013) ...............................................................12

*Baker v. IBP*,
    357 F.3d 685 (7th Cir. 2004) ............................................................................14

*Berry v. Cnty. of Sonoma*,
    30 F.3d 1174 (9th Cir. 1994) ............................................................................17

*Chavez v. AmeriGas Propane, Inc., CV 13-05813MMM(MANx)*,
    2015 WL 12859721 (C.D. Cal. Feb. 11, 2015) ................................................17

*Gen. Tel. Co. of the Southwest v. Falcon*,
    457 U.S. 147 (1982) .........................................................................................11

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992) ............................................................................11

*Levias v. Pac. Maritime Ass'n, 08-cv-1610-JPD*,
    2010 WL 358499 (W.D. Wash. Jan. 25, 2010) ...........................................16, 17

*Levias v. Pac. Maritime Ass'n*,
    760 F.Supp. 2d 1036 (W.D. Wash. Jan. 7, 2011) .............................................14

*Magadia v. Wal-Mart Associates, Inc.*,
    324 F.R.D. 213 (N.D. Cal. Jan. 9, 2018) .........................................................12

*Owens v. Local No. 169, Ass'n of W. Pulp and Paper Workers*,
    971 F.2d 347 (9th Cir. 1992) ............................................................................17

*Rodriguez v. Hayes*,
    591 F.3d 1105 (9th Cir. 2010) ..........................................................................12

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S 338, 131 S.Ct. 2541 (2011) ................................................................11

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001) ..........................................................................11

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TEL: (415) 771-6400 FAX: (415) 771-7010

**NLRB Cases**

*Shipowners' Ass'n of the Pac. Coast*,
    7 NLRB 1002 (1938)..................................................................................4, 5

**Federal Statutes**

29 U.S.C. § 159(a) ....................................................................................... 14

**Federal Rules**

Fed. R. Civ. P. 23(a)(4) ..................................................................3, 12, 15, 16, 17

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TEL: (415) 771-6400 FAX: (415) 771-7010

iii

Exhibit A
Page 4

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TEL: (415) 771-6400 FAX: (415) 771-7010

## I. **INTRODUCTION**

Proposed Amicus the International Longshore and Warehouse Union ("ILWU" or "the Union") submits this brief in opposition to Plaintiffs' Motion for Class Certification of all Subclasses based upon Plaintiffs' erroneous assertion that ILWU-represented employees are under the control of the Pacific Maritime Association ("PMA") or PMA-member companies while at the Dispatch Hall and are required to obtain a Transportation Worker Identification Credential ("TWIC") as a condition of employment.[1]

ILWU is the union and certified collective bargaining representative for all longshore workers and marine clerks on the West Coast of the United States, including all of those in the State of California encompassed by Plaintiffs' asserted class and subclasses. While Plaintiffs purport to represent the interests of longshore workers, their claims are in fact antithetical to these workers' interests. ILWU submits this amicus brief to provide the Court with the Union's position on the adequacy of the proposed class representatives. Plaintiffs' arguments attempting wooden applications of the Labor Code would, if given credence, undercut longshore workers' hard fought victories over the PMA Employers to secure and maintain union control of dispatch. Plaintiffs' arguments would also undercut the ILWU's victories fought to prevent a federal credentialing program (TWIC) from becoming an employer tool for worker harassment, control, and exclusion of workers from employment.

---

[1] The dispatch hall and TWIC-related claims include: Reporting Time Subclasses, Pre-Shift Wages Subclasses, Mileage Reimbursement Subclasses, and, as incorporated therein, the Unfair Competition Subclass and the Terminated Employee Waiting Time Sub class, and of the TWIC Card Expense Subclass and, as incorporated therein, the Unfair Competition Subclass.

As argued in Plaintiffs' Motion for Class Certification, Plaintiffs' Proposed Wage Statement Subclass does not concern the Dispatch Hall or any other collectively bargained practice and, for that reason, ILWU is not at this time submitting a brief regarding that Subclass.

1

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TEL: (415) 771-6400 FAX: (415) 771-7010

1   Plaintiffs' principle claims are an attack on the dispatch process.   The
2   dispatch system, along with the enviable wage rates, premium pay and hours
3   guarantees found in the Pacific Coast Longshore and Clerks' Agreement
4   ("PCL&CA"),[2] are the product of decades of struggle. Plaintiffs' dispatch hall-
5   related subclasses–especially for pre-shift work and travel time from the union hall
6   to the terminal—constitute an attack on the dispatch system and the ILWU.
7   Plaintiffs' claims mischaracterize the dispatch halls as under the employers'
8   exclusive control and part of the job site. These assertions are false and dangerous
9   as they undercut the interests of the ILWU longshore bargaining unit that Plaintiffs
10  aspire to represent in this litigation. Therefore, Plaintiffs are not adequate class
11  representatives.

12   Plaintiffs' expense reimbursement claim is an attack on arbitral precedent.
13  When the federal government imposed the "Transportation Worker Identification
14  Credential" or TWIC card at terminals following September 11, 2001, ILWU fought
15  to protect its members' ability to continue to work. ILWU also fought to prevent
16  PMA and employers from using TWIC as a means to invade workers' privacy,
17  discipline, harass or control them. Fundamental to ILWU's struggle was
18  establishing through arbitration that TWIC was not a condition of longshore
19  employment and that PMA is required to escort any workers who do not have TWIC
20  cards so that they can access the job sites or pay the workers lost work opportunity
21  claims if they refuse to escort them. Plaintiffs' proposed TWIC-related subclasses
22  directly conflict with this protection and, likewise, make Plaintiffs inadequate class
23  representatives.

24   As discussed below, Plaintiffs' Motion for Class Certification of the dispatch
25  hall- and TWIC-related subclasses should be denied because this litigation conflicts
26  with the interests of the ILWU and the workers it represents, and therefore the
27
28

---

[2] *See* Exh. 1, Decl. of Ponce De Leon ¶¶ 4-15.

2

1  Plaintiffs have failed to demonstrate that they are adequate representatives as
2  required by Fed. R. Civ. P. 23(a)(4).

3  **II.   STATEMENT OF FACTS**

4  **A.   ILWU and the Longshore/Clerk Agreement**

5      The ILWU is the exclusive bargaining representative of a single coast-wide
6  bargaining unit of roughly 25,000 longshore workers and marine clerks employed
7  by the defendant PMA and its member companies in twenty-six ports from San
8  Diego, California to Bellingham, Washington, including all commercial ports in
9  California. *See* Exh. 1, Declaration of Francisco Ponce De Leon, III, ¶ 4. Defendant
10 PMA is a multi-employer association of steamship lines, stevedoring companies
11 and marine terminal operators doing business on the West Coast, including the ports
12 in California. *Id*. Several of these PMA member companies are also defendants in
13 this case.[3] *Id*.

14     The ILWU and the PMA Employers have been signatories to successive
15 collective bargaining agreements governing the wages, hours and working
16 conditions of West Coast longshore and marine clerk workers since 1937. *Id*. at ¶
17 5. The current agreement, the PCL&CA, is contained in two contract documents –
18 the Pacific Coast Longshore Contract Document (PCLCD) and the Pacific Coast
19 Clerks' Contract Document (PCCCD). *Id*. The PCL&CA addresses in detail the
20 operation of dispatch halls. *Id*. at ¶ 6. The dispatch halls refer longshore and marine
21 clerk workers to jobs at PMA terminals on a daily basis. *Id*. The operation, status,
22 and administration of the dispatch halls are of profound importance to the West
23 Coast longshore industry and, more importantly, to the ILWU and its membership.
24 *Id*.

25 ///

26 ///

27

28

---

[3] In this brief, PMA and its member companies will be referred to collectively as "the PMA Employers."

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TEL: (415) 771-6400 FAX: (415) 771-7010

LEONARD CARDER, LLP
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TEL: (415) 771-6400 FAX: (415) 771-7010
ATTORNEYS

## B.   ILWU's Historic Struggle for Administration of the Longshore and Marine Clerk Dispatch Halls

The longshore and marine clerk dispatch halls are the life-force and lifeblood of the ILWU as an organization. *Id*. at ¶ 7. The PMA Employers do not unilaterally control the dispatch hall operations. *Id*. The PMA Employers do not control the workers when they are at the hall nor when they obtain a job assignment from the hall and travel to the location of the job at the marine terminal. *Id*. The PMA Employers lost unilateral control over the dispatching of job assignments many decades ago and, despite continuous efforts, have been unable to reclaim control. *Id*.

In the "Big Strike of 1934," the ILWU work force, through coastwise strikes, street battles with police and company activists, intermittent disruption of Pacific coast trade, and finally government intervention, ended employer control over work assignments – known as the "shape up" system. *Id*. at ¶ 8. In its place, and over the vigorous objections of the employers, arose a fair and equitable system of distributing work opportunities under union and worker control and oversight, known today as the "joint" dispatch hall system. *Id*.

The historic struggle for the current dispatch hall system and against the former unilateral control of dispatch by the employers is documented in the NLRB's decision in *Shipowners' Ass'n of the Pacific Coast*, 7 NLRB 1002, 1041 (1938) *review dismissed*, 103 F.2d 933 (D.C. Cir. 1939), *aff'd,* 308 U.S. 401 (1940), where the NLRB certified the ILWU as the exclusive bargaining representative for all workers in Pacific Coast ports of the United States for the companies which are the members of five employer associations, which were predecessors to PMA. *Id*. at ¶ 9. The NLRB decision sets forth the following indisputable, historic facts, relevant to the instant matter.

The West Coast dispatch system was created, over the strong objection of the employers, by the October 12, 1934 award of the National Longshore Board, which

1  pre-dated passage of the National Labor Relations Act. *Id*. at ¶ 10. The National
2  Longshore Board had been appointed by President Franklin D. Roosevelt on June
3  26, 1934 to mediate the coastwise longshore strike called on May 9, 1934, known
4  in labor history as the "Big Strike." *Id*. In addition to mandating joint dispatch halls
5  in all West Coast ports, the October 12, 1934, award of the National Longshore
6  Board ordered the employers and the ILWU to establish in each port a joint labor
7  relations committee, responsible for operating the joint dispatch halls and for
8  establishing and maintaining "registered lists" of longshore workers eligible for
9  dispatch to available jobs in the port. *Id*. However, the Board's award gave the
10  ILWU membership the right to elect the dispatchers, and so effectively control the
11  dispatch hall operations. *Id*.

12  Again over the employers' objections, the NLRB ruled that "a unit including
13  all the workers employed as longshore labor in the Pacific Coast ports of the United
14  States is *the one* that will insure to employees the full benefit of the right to self-
15  organization and to collective bargaining." *Shipowners' Ass'n of the Pac. Coast*, 7
16  NLRB at 1022 (emphasis added); Exh. 1, Decl. of Ponce De Leon ¶ 11.  In finding
17  such an expansive unit appropriate, the NLRB specially noted the "failure of the
18  longshoremen to achieve *any* satisfactory collective bargaining agreements when
19  the bargaining was on a local scale" as "contrasted with the highly successful
20  achievements when the longshoremen bargained as a coast unit." *Shipowners' Ass'n*
21  *of the Pac. Coast*, 7 NLRB at 1022 (emphasis added).  Indeed, the NLRB found
22  such a unit *necessary* to balance the bargaining power the employers attained by
23  organizing themselves on a coast-wide basis.  *Id*. at 1024.

24  Following NLRB certification, the ILWU and PMA have negotiated
25  successive collective-bargaining agreements that have continuously included
26  provisions for the joint registration/dispatch system originally mandated by the
27  National Longshore Board. Exh. 1, Decl. of Ponce De Leon ¶ 12. However, the
28  PMA Employers have consistently opposed and sought, through negotiations and

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TEL: (415) 771-6400 FAX: (415) 771-7010

other means, to terminate or substantially reduce the function of dispatch halls for the assignment and allocation of work to longshore and clerk workers. *Id*.

### C. Adversity Between ILWU and the PMA Employers Regarding the Dispatch Halls

One of the main reasons the ILWU has always insisted on union and worker control and oversight of dispatch is the memory of the "shape up," when workers had to grovel and beg for work and were under the control of the employers even before the shift began. *Id*. at ¶ 13. Union control and oversight of dispatch – through the dispatch hall with its democratically-elected rank-and-file dispatchers – ensures that dispatch proceeds in a non-arbitrary and fair way. *Id*. Union control and oversight of dispatch ensures that workers' time before the official start of the shift under the collective bargaining agreement is entirely their own and is totally free from employer domination or interference. *Id*.

The ILWU's long and continuing struggle to obtain and preserve the joint dispatch hall system in the face of PMA Employers' challenges is accurately described in an article prepared by the ILWU Longshore Division Education Committee and published in the ILWU newspaper in 1999. It states in pertinent part:

> The hiring hall—the heart and muscle of the ILWU.
>
> The hiring hall is the heart of the ILWU's brand of democratic unionism. Since 1934, when thousands of longshoremen shut down the Pacific Coast in the great strike that led to the formation of the ILWU, the principles embodied in the ILWU hiring hall have bound together workers who have sought equal opportunity to work under safe conditions at a fair wage. The hiring hall has always been more than a place where jobs are dispatched. It is where earnings and work opportunity are equalized, and jobs are distributed in a fair and democratic system untarnished by prejudice or favoritism. The ILWU hiring hall, which at times was also put in place in the warehouse division of the ILWU, includes the union's cherished principle of fighting against persecution and discrimination based on a person's race, religion or politics. Just as importantly, the hall has also been the center of the Union's internal communication and discipline. On a daily basis, the hall

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TEL: (415) 771-6400 FAX: (415) 771-7010

AMICUS CURIAE BRIEF OF THE INTERNATIONAL LONGSHORE AND WAREHOUSE UNION
CASE NO. 2:19-CV-10421 GW(JCx)

has also been a social and political center of the ILWU longshore community. Weakening the hall and diminishing control over dispatching increases employers' control over work and the workers. In 1934 men died in the struggle to abolish the abuses of the old "shape-up" system.

The shape-up system lent itself to the kinds of abuses where longshoremen had to pay bribes to the employers, shipowners and stevedoring companies who were willing to go to any length to maintain complete control over hiring and to drive pro-union workers out of the industry. In 1934 a union-controlled hiring hall was the demand without which the other demands would be almost impossible to enforce and protect. When it was clear that longshoremen and their seafaring allies were not going to give up their struggle for justice on the waterfront, the employers decided to open the struck piers with guns, goons, tear gas and assorted police agencies including the National Guard.  They provoked pitched battles from San Pedro to Seattle. Hundreds of strikers and bystanders were arrested and injured on July 5, 1934, known ever after as Bloody Thursday. Rather than break the strike, these terrible events galvanized public support and prompted organized labor in San Francisco to declare a brief but historic General Strike to support the longshore and maritime workers and to protest police violence. In the end, after binding arbitration by the federal National Longshore Board, the union's hiring hall was born.  Today, as the ILWU's Longshore Division prepares for coast contract negotiations in 1999, the employers have begun to again mobilize to reassert control over hiring, over who works where, and again seek to divide and weaken the membership through favoritism fed by so-called wage incentives. The arbitration award settling the 1934 strike created jointly operated hiring halls in which union-elected dispatchers distributed the work. Workers eligible for dispatch were on a joint 'registration list." Yet the employers retained their right to have "steady gangs" whose members, chosen directly by the employer, did not get their jobs through the hall, but each day reported to work wherever the employer directed.

After a succession of union grievances the steady gangs were eliminated by an arbitrator's award in 1939. This award by Wayne Morse opened the way for a new era of union and worker control of the workplace and strengthened the ILWU's steadfast view that democratic unionism required equalization of earnings among its members through equal access to work under a hiring hall system that rotated work opportunity fairly among all the members. According to the 1934 arbitration award, employers could participate in setting the rules by which the hall was run. They could also process any defined grievance procedure.  But they could not by-pass the hall and the hiring of union members. Nor could they interfere with the day-to

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TEL: (415) 771-6400 FAX: (415) 771-7010

day operations carried out by the dispatchers, who were union members elected by the rank and file. The coastwise longshore contract governing the Pacific Coast hiring hall gave union members preference work in hiring.

In 1947 the waterfront employers made an all-out assault on the hiring hall using the provisions of the new anti-union Taft-Hartley law. Trying to exploit anti-labor and anti-radical sentiments of the time, the employers sought to dismantle the hall and throw out Harry Bridges the as the ILWU's President.

A bitter strike was waged in 1948, and the union's solidarity and ILWU support compelled the employers to back off and the hiring hall was preserved. Experience has shown that where and when the hiring hall is weakened the union is weakened. The hiring system determines relationships on the job, between workers as well as between worker and employer.

\*         \*         \*         \*         \*

Centralized hiring provides skilled and competent workers on an as-needed basis throughout the peaks and valleys of maritime schedules without the cost of maintaining a steady workforce, makes possible the orderly allocation of the workforce within and between ports and allows for the rational promotion of members according to seniority after equitable recruitment and training. Today, the refrain from the PMA is to "regain control of their work force." Fifty years ago, when the employers set out to smash the ILWU, to displace its democratically elected leadership, and to dismantle the hiring hall, they said they "only want to control hiring." The employers have the same objective today. In 1999 longshore negotiations the ILWU will have to be prepared to wage the same fight with the same solidarity and unity of purpose that in 1934 laid the cornerstone of our unmatched wages and conditions: the hiring hall.

*See* Exh. 1, Decl. of Ponce De Leon ¶ 14, and Exh. "A" thereto.

Since the 1999 publication of the above ILWU article, the PCL&CA was re-negotiated in 1999, 2002, 2008, 2014, and 2019. *Id*. at ¶ 15. In all five sets of bargaining, the PMA Employers attempted to negotiate curtailment of the longshore and marine clerk dispatch halls, not just as a cost-saving measure but to weaken ILWU power. *Id*. The PMA Employers' attacks on the dispatch hall were beaten back only by the ILWU's conviction that the preservation of the coastwise

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TEL: (415) 771-6400 FAX: (415) 771-7010

8

bargaining unit, the coastwise agreement and the solidarity of the union workers stand or fall on the preservation of the dispatch halls, overseen on a daily basis by the ILWU and the workers that make up the ILWU. *Id*.

### D.   Current Administration of the Dispatch Halls

At all material times through the present, the longshore industry dispatch halls have been located and administered in each port, including in the State of California. *Id*. at ¶ 16. Under the collective bargaining agreement, workers are not hired at or by the dispatch hall. *Id*. Rather, the dispatch hall notifies the worker as to the availability of specific jobs under the PCL&CA from work orders placed by the various PMA Employers, which those workers can pick or obtain. *Id*. Jobs commence when the worker reports for duty at one of the PMA Employers' terminals. *Id*. The PMA Employers do not have any control over workers when they are in the hall or when they travel from the hall to the waterfront jobsites. *Id*.

When workers are at the dispatch hall waiting to see if there are jobs available for the next shift, they are free to do what they want, including personal and union business, so long as they do not violate their dispatch rules of conduct. *Id*. at ¶ 20. For example, the following types of interactions can take place at the dispatch halls: politicians speaking to ILWU members, ILWU members distributing literature relating to internal union and outside political activity, ILWU members speaking to other members about internal union governance, memorial services for fallen workers, and regular socializing. *Id*. When workers travel from the dispatch hall to the job site, they are not under the control of the PMA Employers. *Id*. They are free to stop for food or drinks, run personal errands, and go to their homes. *Id*.

The terms and conditions for administration of the dispatch halls are set forth in the PCL&CA as well as in supplemental, regional and port agreements, which are negotiated by the local PMA representatives, local employers and ILWU locals. *Id*. at ¶ 21. The current PCL&CA, effective by its terms through July 1, 2022, contains various provisions regarding the maintenance of the "joint"

LEONARD CARDER, LLP
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TEL: (415) 771-6400 FAX: (415) 771-7010
ATTORNEYS

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TEL: (415) 771-6400 FAX: (415) 771-7010

1  registration/dispatch system, first mandated by the federal National Longshore

2  Board. *Id*. In particular, section 8.1 provides for the joint maintenance and operation

3  by the ILWU and the PMA of longshore and clerk dispatching halls in each port

4  covered by the Agreement, including all ports in California:

5      8.11 – The dispatching of all longshoremen shall be through halls maintained

6      and operated jointly by the ILWU Longshore and Warehouse Union and the
    Pacific Maritime Association in accordance with the provisions of section 17.

7      There shall be one central dispatching hall in each of the ports with such

8      branch halls as shall be mutually agreed upon.

9  *Id*. Section 17.12 of the PCL&CA lists as the first duty of the Joint Port Labor

10  Relations Committee – "To maintain and operate the dispatching hall" under the

11  "ultimate control of the Coast Labor Relations Committee." *Id*.

12      Although longshore and clerk registration lists are maintained for each port,

13  such registration is treated as "coastwise" under section 8.32 and other provisions

14  of the PCL&CA in accordance with the coastwise bargaining unit itself. *Id*. at ¶ 22.

15  Pursuant to section 8.41, fully-registered Class "A" longshoremen are given first

16  preference in dispatch to available jobs in their respective categories; limited-

17  registered Class "B" longshoremen are given second preference, and unregistered

18  or casual workers, including Identified Casuals, are dispatched only after all

19  registered employees have been afforded an opportunity to work.  *Id*. Casuals are

20  an auxiliary workforce, which supplements the fluctuating labor needs of the

21  industry. *Id*.

22              **E.**    **Transportation Worker Identification Credential**

23      After September 9, 2011, the government started requiring workers at port

24  facilities to have a TWIC Card, or Transportation Worker Identification Credential.

25  *Id*. at ¶ 27. Obtaining a TWIC requires an individual to go through a background

26  check including a criminal records screen. *Id*. ILWU has long opposed TWIC

27  because it does not make the ports safer and because it would prohibit some

28  represented longshore workers and marine clerks from being able to work because

of their past history with the law or because of mistakes in government criminal record reports. *Id*. In particular, ILWU has been concerned that the PMA Employers would use TWIC to their advantage to track workers for disciplinary or anti-union purposes. *Id*. Therefore, the position of the ILWU has long been that whether a worker obtains a TWIC is between him or her and the government. *Id*.

The ILWU successfully prevented the PMA Employers from intervening in the TWIC process through arbitration. Specifically, in July 22, 2009, Coast Arbitrator John Kagel issued this final and binding decision on all PMA Employers: (1) granting the ILWU's motion that, "The possession of a TWIC is not a condition of employment under the PCL&CA;" and (2) requiring PMA to "escort" any workers who do not have TWIC cards so that they can access the job sites or pay the workers lost work opportunity claims if they refuse to escort them. *See* Exh. 1, Decl. of Ponce De Leon ¶ 27, and Exh. "B" thereto. Since the issuance of this decision, ILWU and its locals have successfully obtained lost work opportunity payments for represented employees who did not have a TWIC card and for whom PMA failed to provide an escort so that they could access the job site. *Id*.

## III.   <u>ARGUMENT</u>

A party seeking to certify a class must demonstrate that it has met ***all four*** requirements of Rule 23(a), and at least one of the requirements of Rule 23(b). *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001) (citing *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). There is no presumption in favor of class certification. Instead, the trial court must conduct a "rigorous analysis" to determine if the party seeking certification has met the prerequisites of Rule 23. *Id*.; *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 161 (1982). "Frequently, that rigorous analysis will entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S 338, 131 S.Ct. 2541, 2552 (2011) (internal quotations omitted). "Merits questions may be considered to the extent—but only to the extent—that they are

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TEL: (415) 771-6400 FAX: (415) 771-7010

relevant to determining whether the Rule 23 prerequisites for class certification are satisfied. *Magadia v. Wal-Mart Associates, Inc.*, 324 F.R.D. 213, 219 (N.D. Cal. Jan. 9, 2018) (citing *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 133 S.Ct. 1184, 1195 (2013)) (internal quotations omitted).

As discussed below, Plaintiffs cannot satisfy the requirements of Fed. R. Civ. P. 23, and obtain class certification, because they cannot meet their burden of showing that they are adequate representatives for the proposed classes in this matter.

### A. Plaintiffs are Inadequate Representatives Whose Interests Strongly Conflict with the Workers They Aspire to Represent for the Reporting Time, Pre-Shift Time, and Mileage Reimbursement Subclasses.

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23. "Whether the class representatives satisfy the adequacy requirement depends on the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive." *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010) (internal quotations omitted). This is where the Plaintiffs' Motion for Class Certification fails. Plaintiffs have taken positions in this case that are so fundamentally at odds with the core principals of the ILWU and the workers that it represents that Plaintiffs cannot be deemed adequate representatives of the interests of the class they seek to represent.

Through this lawsuit and the pending motion, the Plaintiffs have launched a frontal and dangerous assault on the dispatch halls that ILWU workers shed blood to establish in 1934 and have fought to maintain ever since against employer attack. *See* Exh. 1, Decl. of Ponce De Leon ¶¶ 7-15. The historic importance of the dispatch halls to the ILWU and its membership is detailed, at length, in the declaration of ILWU Coast Longshore Division Officer Francisco Ponce De Leon, III, appended

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TEL: (415) 771-6400 FAX: (415) 771-7010

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TEL: (415) 771-6400 FAX: (415) 771-7010

to this brief as **Exhibit 1**. The dispatch halls are the purest expression of the founding principle of the ILWU that democratic unionism requires equalization of work opportunity and earnings among the members, goals that can only be achieved and protected by rotation of jobs from member to member from the dispatch hall instead of at the workplace under the control of the employers. *See* Exh. 1, Decl. of Ponce De Leon ¶¶ 7-15.

Plaintiffs' allegations threaten the existence of the Union dispatch halls coast-wide by asserting that Plaintiffs' workday starts at the dispatch hall and that workers are under the control of the PMA Employers while at the dispatch halls. *See* Dkt. 37-1, Plaintiff Evagelos Andrikos' Motion for Class Certification, Section III.[4] Should the Plaintiffs prevail, the dispatch halls would be in danger of extinction. While the PMA Employers do not here dispute that the dispatch halls are largely controlled by the ILWU, the Employers only adopted them upon order of the federal government and since then have attempted to curtail the dispatch halls in subsequent negotiations, recognizing that the dispatch halls are a critical source of the ILWU's strength as an organization and bargaining power. *See* Exh. 1, Decl. of Ponce De Leon ¶¶ 7-15. The Employers are certain to use any victory garnered by the Plaintiffs in this case as the centerpiece of its next bid to wrest control of the halls away from the ILWU and to demand concessions, financial and otherwise, at the bargaining table. Because the relief Plaintiffs seek is so fundamentally in conflict with the interests and will of the Union to preserve and protect the dispatch halls in perpetuity, they are not adequate representatives of the proposed class. Given this, it is no surprise that the Plaintiffs acknowledge that their lawsuit is not supported by the Union or its membership.[5] Paul Ruiz Depo. 124: 15-23 ("Q. Okay. And do

---

[4] "Since the time at the dispatch hall is under the control of the employer, then the travel from the dispatch hall to the work site would also be under the control of the employer and therefore compensable." *Id.* at 11.

[5] Evagelos Andrikos Depo. 102: 4-20; Bryant G. Burns Depo. 212: 8-23; Michael Olvera Depo. 89: 17-23; Paul Ruiz Depo. 124: 15-25, 125: 1-10.

AMICUS CURIAE BRIEF OF THE INTERNATIONAL LONGSHORE AND WAREHOUSE UNION
CASE NO. 2:19-CV-10421 GW(JCx)

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TEL: (415) 771-6400 FAX: (415) 771-7010

1  you have any understanding of what the reasoning by the ILWU international is?
2  A. From what I read, it could have us put our halls in jeopardy of losing them. It
3  could interfere with contract negotiations. That's what I've heard. That's what I
4  read").

5       What is more, because the PCL&CA addresses, *inter alia*, issues of
6  compensation and travel time – issues at the core of this lawsuit—the ILWU, not
7  the Plaintiffs, is the only proper representative to address the issues raised in this
8  action. Plaintiffs, through this litigation, attempt to step into the shoes of the ILWU
9  and negotiate different terms and conditions of employment for longshore workers.
10  As the 7th Circuit explained in *Baker v. IBP*, 357 F.3d 685, 690 (7th Cir. 2004),
11  "…it still does not follow that plaintiffs are entitled to represent all of the other
12  workers. They *have* a representative—one that under the NLRA is supposed to be
13  'exclusive' with respect to wages, see 29 U.S.C. § 159(a)—their union."

14       Other attempts to litigate pre-shift work claims on behalf of other longshore
15  workers have also failed. In *Levias v. Pac. Maritime Ass'n*, the district court rejected
16  the argument that plaintiffs in that matter were "hired" by the PMA Employers at
17  the dispatch hall. *Levias v. Pac. Maritime Ass'n*, 760 F.Supp. 2d 1036, 1050 (W.D.
18  Wash. Jan. 7, 2011). The court held, "[i]n light of the substantial evidence regarding
19  the origins and function of the dispatch halls provided by ILWU, as well as the
20  parties' agreements discussed *supra*, plaintiffs' bare assertion that they consider
21  themselves to have been 'hired' by PMA's employer-members at the dispatch hall
22  does not present a genuine issue of material fact on this issue." *Id*. As the declaration
23  of Francisco Ponce De Leon, III illustrates, the dispatch halls are not unilaterally
24  controlled by the PMA employers, and Plaintiffs' argument to the contrary
25  illustrates that they are incapable of protecting the interests of the putative class—
26  other ILWU represented employees who depend on the dispatch halls to ensure
27  equal work opportunity and Union strength in negotiations with the PMA
28  Employers—in this litigation.

## B. Plaintiffs are Inadequate Representatives Whose Interests Strongly Conflict with the Workers They Aspire to Represent for TWIC Card Expense Claim

Similarly, Plaintiffs cannot satisfy the requirements of Fed. R. Civ. P. 23(a)(4) as to their TWIC Card Expense claim. Like the claims concerning the dispatch hall and dispatch process, the Plaintiffs' mischaracterize the TWIC card in their pleadings. Importantly, Plaintiffs allege that "[a]ll port workers are required to obtain a Transportation Workers Identification Credential card ('TWIC') to be able to access the docks. Thus, a TWIC card is an expense which is necessary for the workers to be able to discharge their duties." *See* Dkt. 37-1, Plaintiff Evagelos Andrikos' Motion for Class Certification, Section III(E). This is incorrect representation of role of TWIC cards.

Based on an agreement reached following contractual arbitration between the ILWU and the PMA Employers under the PCL&CA, the TWIC card is explicitly not a condition of employment for longshore workers and marine clerks. As detailed in the declaration of Francisco Ponce De Leon, the government began requiring workers at port facilities to have a TWIC card after September 9, 2011. *See* Exh. 1, Decl. of Ponce De Leon ¶ 27. To obtain a TWIC card, an individual is required to undergo a background check, including a criminal record screen. *Id*. The ILWU has opposed TWIC cards for several reasons, including the Union's belief that the cards do not make ports safer and because TWIC would prohibit some workers from being able to work because of their past history with the law or because of mistakes in government criminal record reports. *Id*. Additionally, the ILWU has been concerned that the PMA employers would use TWIC to track workers for disciplinary or anti-union purposes. *Id*. Given these concerns, the ILWU has maintained that whether a worker obtains a TWIC card, that process is between the individual and the government, and does not concern the PMA Employers. *Id*.

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TEL: (415) 771-6400  FAX: (415) 771-7010

Importantly, given the ILWU's advocacy on this issue, workers do not lose the opportunity to work if they do not have TWIC. In 2009, a final and binding arbitration decision on all PMA Employers issued, which: (1) granted the ILWU's motion that the possession of a TWIC is not a condition of employment under the PCL&CA; and (2) required PMA to escort any workers who do not have TWIC cards so that they can access the job sites, or pay the workers lost work opportunity claims if they refuse to escort them. *See* Exh. 1, Decl. of Ponce De Leon ¶ 27, and Exh. "B" thereto. Since this decision issued, the Union and its locals have successfully obtained lost work opportunity payments for represented employees who do not have a TWIC card, and for whom PMA failed to provide an escort so they could work at the job site. *Id*. As a result, Plaintiffs' claim that they are required to have a TWIC card to discharge their duties is incorrect – the ILWU worked to ensure that its members are not required to have TWIC as a condition of employment or in order to have access to job sites. Thus, Plaintiffs' assertion that TWIC is a condition of employment, and therefore they are entitled to reimbursement, is in direct conflict with ILWU-represented workers, whose interests are protected by keeping the PMA employers out of the TWIC process.

## C. Denial of Class Certification is Supported by *Levias* Litigation

Another district court, considering almost identical claims and facts, denied class certification based upon the ILWU's opposition to the claims of the proposed class representatives. *Levias v. Pac. Maritime Ass'n*, 08-cv-1610-JPD, 2010 WL 358499 (W.D. Wash. Jan. 25, 2010). Specifically, the *Levias* court held that the requirement of Rule 23(a)(4) was not satisfied because plaintiffs' interests were in conflict with those of the putative class members.

> Here, Plaintiffs' interests conflict with the interests of the putative class members. Most significantly, Plaintiffs and the putative class members are union members whose interests have long been represented by the ILWU…The ILWU characterizes the lawsuit as a 'frontal and dangerous

LEONARD CARDER, LLP
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TEL: (415) 771-6400 FAX: (415) 771-7010
ATTORNEYS

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TEL: (415) 771-6400  FAX: (415) 771-7010

1
2
3
4
5
6

assault' on the union-run dispatch hall, which according to the ILWU is required for the equalization of longshore work among the union's members…**the ILWU's point is well taken, because if longshore workers are deemed 'on the clock' at the employers' expense from the moment they leave the dispatch hall, which for some may be nearly an hour before the shift starts, the employers have a credible case that the dispatch hall is superfluous and should be abolished**, and that work assignments can be determined by the employers and communicated via telephone, and the internet or at the various job sites.

7   *Id*. at *5. There is no dispute that an inherent conflict exists between the Plaintiffs'

8   claims, and the ILWU and the workers it represents. At the heart of this dispute is

9   ILWU's position that democratic unionism requires equalization of work

10  opportunity and earnings among the members, goals that can only be achieved and

11  protected by rotation of jobs from member to member from the dispatch hall instead

12  of at the workplace under the control of the Employers. This is in direct conflict

13  with the Plaintiffs' position that the PMA Employers control the dispatch hall. As

14  a result, in this litigation Plaintiffs' assertion that the dispatch hall is employer

15  controlled – which is the backbone of their reporting time, pre-shift time, and

16  mileage reimbursement claims—puts them in direct conflict with ILWU members

17  they seek to represent. As the *Levias* court held, this conflict cannot be remedied,

18  and the requirements of Fed. R Civ. P. 23(a)(4) cannot be satisfied.[6]

19  ///

20  ///

21  ///

22

23  ───────────────

[6] Likewise, just as whether work is compensable under a collective bargaining

24  agreement is relevant to determining whether "on call" time is actual work, so is a

25  collective bargaining agreement and the Union's interpretation thereof to whether employees are under employer control and to what are reimbursable conditions of

26  employment. *See also Owens v. Local No. 169, Ass'n of W. Pulp and Paper Workers*, 971 F.2d 347, 350 (9th Cir. 1992); *Berry v. Cnty. of Sonoma*, 30 F.3d 1174, 1180

27  (9th Cir. 1994), *applied to Labor Code claims in*, *Chavez v. AmeriGas Propane, Inc.*, CV 13-05813MMM(MANx), 2015 WL 12859721 (C.D. Cal. Feb. 11, 2015), *and*

28  *Allen v. Labor Ready Southwest, Inc.*, CV 09-04266 DDP (AGRx), 2010 WL 11509051 (C.D. Cal. Dec. 2, 2010).

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TEL: (415) 771-6400 FAX: (415) 771-7010

## IV.   **CONCLUSION**

For the foregoing reasons, the ILWU respectfully requests the Court deny Plaintiffs' Motion for Class Certification of the following subclasses as the Plaintiffs are in conflict with the ILWU and the workers it represents and, therefore, inadequate class representatives:

1.   Reporting Time Subclasses;

2.   Pre-Shift Wages Subclasses;

3.   Mileage Reimbursement Subclasses;

4.   TWIC Card Expense Subclass;

5.   Unfair Competition Subclass insofar as it is based upon the claims alleged in the Reporting Time, Pre-Shift Wages, Mileage Reimbursement, and TWIC Card Expense Subclasses; and

6.   Terminated Employee Waiting Time Subclass insofar as it is based upon the claims alleged in the Reporting Time, Pre-Shift Wages, and Mileage Reimbursement Subclasses.

Respectfully submitted,

LEONARD CARDER, LLP

DATE: November 19, 2020      By:      /s/ Emily M. Maglio
Eleanor Morton (SBN 220407)
Emily Maglio (SBN 267190)
Afroz Baig (SBN 308324)

*Attorneys for Proposed Amicus,*
INTERNATIONAL LONGSHORE
AND WAREHOUSE UNION

18