# EXHIBIT 1

LEONARD CARDER, LLP
**Eleanor Morton** (SBN 220407)
emorton@leonardcarder.com
**Emily Maglio** (SBN 267190)
emaglio@leonardcarder.com
**Afroz Baig** (SBN 308324)
abaig@leonardcarder.com
1188 Franklin Street, Suite 201
San Francisco, CA 94109
Tel: (415) 771-6400
Fax: (415) 771-7010

*Attorneys for*
INTERNATIONAL LONGSHORE
AND WAREHOUSE UNION

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EVAGELOS ANDRIKOS, et al.<br><br>　　　　Plaintiffs,<br><br>v.<br><br>PACIFIC MARITIME ASSOCIATION, et al.<br><br>　　　　Defendants. | Case No. 2:19-cv-10421 GW(JCx)<br><br>**DECLARATION OF FRANCISCO PONCE DE LEON, III, IN SUPPORT OF ILWU'S MOTION TO FILE AN AMICUS BRIEF AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date:　December 17, 2020<br>Time:　8:30 A.M.<br>Judge:　Hon. George H. Wu<br>Ctrm:　9D, 9th Floor |

I, Francisco Ponce De Leon, III, state and declare as follows:

1. I am currently an elected official of the Coast Longshore Division of the International Longshore and Warehouse Union ("ILWU"), and a member of the Coast Labor Relations Committee ("CLRC"), a joint labor-management committee composed of representatives of the ILWU Coast Longshore Division and the Pacific Maritime Association ("PMA") at the highest level. My title is Coast Committeeman. I am elected by eligible members of the longshore and marine clerk coastwise bargaining unit from Bellingham, Washington to San Diego, California. As a union officer, I am accountable to the bargaining unit as a whole. I and the other ILWU Coast Committee Members are obligated to act in their collective interests. Positions we take are subject to review by the membership through our union's democratic processes, such as the ILWU Longshore Caucus, which meets yearly or more, and at the ballot box when we run for reelection every three years. I have held this position since October 5, 2015.

2. I am a third generation longshoreman and have been a member of the ILWU since September 1984. Since then and prior to my election as an ILWU Coast Longshore Division Officer, I had held many positions at ILWU Local 13, including Night Flex Dispatcher, Executive Board Member, Picket Captain, Convention Delegate, Coast Longshore Caucus Delegate, and Secretary/Treasurer and served as an International Executive Board representative and trustee for the Southern California Area. As a Delegate to the Coast Longshore Caucus, I served on both Coast Budget and Dispatch Hall Committees. I have personal knowledge of each matter stated herein and could testify competently thereto if called as a witness.

3. As an ILWU Coast Committeeman, I am one of four elected members of the ILWU Coast Committee. The ILWU Coast Committee, an intermediate division of the ILWU International, is in charge of administering and

1  negotiating for the ILWU the terms of the Pacific Coast Longshore and Clerks'
2  Agreement (PCL&CA), which is the collective bargaining agreement between the
3  ILWU International, and its affiliated longshore division locals (including locals
4  in Washington) and the Pacific Maritime Association (PMA) and its member
5  companies.  The PCL&CA covers the terms and conditions of employment for
6  approximately 25,000 registered and casual longshore workers and marine clerks
7  in the twenty-six (26) commercial ports of the West Coast of the United States,
8  including the ports in California.  As a member of the ILWU Coast Committee, I
9  represent the ILWU on the Joint Coast Labor Relations Committee (JCLRC),
10  which is the highest joint labor relations committee that administers the PCL&CA
11  and adjudicates grievances and disputes thereunder.

## ILWU and the Longshore/Clerk Agreement

13  4.  The ILWU is the exclusive bargaining representative of a single
14  coast-wide bargaining unit of roughly 25,000 longshore workers and marine
15  clerks employed by the defendant PMA and its member companies in twenty-six
16  ports from San Diego, California to Bellingham, Washington, including all
17  commercial ports in California.  Defendant PMA is a multi-employer association
18  of steamship lines, stevedoring companies and marine terminal operators doing
19  business on the West Coast, including the ports in California.  Several of these
20  PMA member companies are also defendants in this case.  In this declaration, I
21  refer to PMA and its member companies collectively as "the PMA Employers."

22  5.  The ILWU and the PMA Employers have been signatories to
23  successive collective bargaining agreements governing the wages, hours and
24  working conditions of West Coast longshore and marine clerk workers since 1937.
25  The current agreement, the PCL&CA, is contained in two contract documents –
26  the Pacific Coast Longshore Contract Document (PCLCD) and the Pacific Coast
27  Clerks' Contract Document (PCCCD).

28

6. The PCL&CA addresses in detail the operation of dispatch halls. The dispatch halls refer longshore workers to jobs at PMA terminals on a daily basis. The operation, status, and administration of the dispatch halls are of profound importance to the West Coast longshore industry (a phrase when used that includes both longshore and marine clerk workers) and, more importantly, to the ILWU and its membership.

### ILWU's Historic Struggle For Administration of the Longshore and Marine Clerk Dispatch Halls

7. The longshore and marine clerk dispatch halls are the life-force and lifeblood of the ILWU as an organization. The PMA Employers do not unilaterally control the dispatch hall operations. The PMA Employers do not control the workers when they are at the hall nor when they obtain a job assignment from the hall and travel to the location of the job at the marine terminal. The PMA Employers lost unilateral control over the dispatching of job assignments many decades ago and, despite continuous efforts, have been unable to reclaim control.

8. In the "Big Strike of 1934," the ILWU work force, through coastwise strikes, street battles with police and company activists, intermittent disruption of Pacific coast trade, and finally government intervention, ended employer control over work assignments – known as the "shape up" system. In its place, and over the vigorous objections of the employers, arose a fair and equitable system of distributing work opportunities under union and worker control and oversight, known today as the "joint" dispatch hall system.

9. The historic struggle for the current dispatch hall system and against the former unilateral control of dispatch by the employers is documented in the NLRB's decision in *Shipowners' Association of the Pacific Coast*, 7 NLRB 1002, 1041 (1938) *review dismissed*, 103 F.2d 933 (D.C. Cir. 1939), *aff'd,* 308 U.S. 401 (1940), where the NLRB certified the ILWU as the exclusive bargaining

representative for all workers in Pacific Coast ports of the United States for the companies which are the members of five employer associations, which were predecessors to PMA. The NLRB decision sets forth the following indisputable, historic facts relevant here:

10. The West Coast dispatch system was created, over the strong objection of the employers, by the October 12, 1934 award of the National Longshore Board, which pre-dated passage of the National Labor Relations Act. The National Longshore Board had been appointed by President Franklin D. Roosevelt on June 26, 1934 to mediate the coastwise longshore strike called on May 9, 1934, known in labor history as the "Big Strike." In addition to mandating joint dispatch halls in all West Coast ports, the October 12, 1934, award of the National Longshore Board ordered the employers and the ILWU to establish in each port a joint labor relations committee, responsible for operating the joint dispatch halls and for establishing and maintaining "registered lists" of longshore workers eligible for dispatch to available jobs in the port. However, the Board's award gave the ILWU membership the right to elect the dispatchers, and so effectively control the dispatch hall operations.

11. Again over the employers' objections, the NLRB ruled that "a unit including all the workers employed as longshore labor in the Pacific Coast ports of the United States is *the one* that will insure to employees the full benefit of the right to self-organization and to collective bargaining." *Id*. at 1022 (emphasis added). In finding such an expansive unit appropriate, the NLRB specially noted the "failure of the longshoremen to achieve *any* satisfactory collective bargaining agreements when the bargaining was on a local scale" as "contrasted with the highly successful achievements when the longshoremen bargained as a coast unit." *Id.* (Emphasis added). Indeed, the NLRB found such a unit *necessary* to balance the bargaining power the employers attained by organizing themselves on a coast-wide basis. *Id*. at 1024.

12. Following NLRB certification, the ILWU and PMA have negotiated successive collective-bargaining agreements that have continuously included provisions for the joint registration/dispatch system originally mandated by the National Longshore Board. However, the employers have consistently opposed and sought, through negotiations and other means, to terminate or substantially reduce the function of dispatch halls for the assignment and allocation of work to longshore and clerk workers.

**Adversity Between ILWU and PMA Employers re the Dispatch Halls**

13. One of the main reasons the ILWU has always insisted on union and worker control and oversight of dispatch is the memory of the "shape up," when workers had to grovel and beg for work and were under the control of the employers even before the shift began. Union control and oversight of dispatch – through the dispatch hall with its democratically-elected rank-and-file dispatchers – ensures that dispatch proceeds in a non-arbitrary and fair way. Union control and oversight of dispatch ensures that workers' time before the official start of the shift under the collective bargaining agreement is entirely their own and is totally free from employer domination or interference.

14. The ILWU's long and continuing struggle to obtain and preserve the joint dispatch hall system in the face of PMA Employers' challenges is accurately described in an article prepared by the ILWU Longshore Division Education Committee and published in the ILWU newspaper in 1999, attached as **Exhibit "A"** to this Declaration. It states in pertinent part:

**The Hiring Hall – Coast Education Project**

The hiring hall—the heart and muscle of the ILWU.

The hiring hall is the heart of the ILWU's brand of democratic unionism. Since 1934, when thousands of longshoremen shut down the Pacific Coast in the great strike that led to the formation of the ILWU, the principles embodied in the ILWU hiring hall have bound together workers

who have sought equal opportunity to work under safe conditions at a fair wage. The hiring hall has always been more than a place where jobs are dispatched. It is where earnings and work opportunity are equalized, and jobs are distributed in a fair and democratic system untarnished by prejudice or favoritism.  The ILWU hiring hall, which at times was also put in place in the warehouse division of the ILWU, includes the union's cherished principle of fighting against persecution and discrimination based on a person's race, religion or politics. Just as importantly, the hall has also been the center of the Union's internal communication and discipline. On a daily basis, the hall has also been a social and political center of the ILWU longshore community. Weakening the hall and diminishing control over dispatching increases employers' control over work and the workers. In 1934 men died in the struggle to abolish the abuses of the old "shape-up" system.

The shape-up system lent itself to the kinds of abuses where longshoremen had to pay bribes to the employers, shipowners and stevedoring companies who were willing to go to any length to maintain complete control over hiring and to drive pro-union workers out of the industry. In 1934 a union-controlled hiring hall was the demand without which the other demands would be almost impossible to enforce and protect. When it was clear that longshoremen and their seafaring allies were not going to give up their struggle for justice on the waterfront, the employers decided to open the struck piers with guns, goons, tear gas and assorted police agencies including the National Guard.  They provoked pitched battles from San Pedro to Seattle. Hundreds of strikers and bystanders were arrested and injured on July 5, 1934, known ever after as Bloody Thursday. Rather than break the strike, these terrible events galvanized public support and prompted organized labor in San Francisco to declare a brief but historic General Strike to support the longshore and maritime workers and to protest police violence. In the end, after binding arbitration by the federal National Longshore Board, the union's hiring hall was born.  Today, as the ILWU's Longshore Division prepares for coast contract negotiations in 1999, the employers have begun to again mobilize to reassert control over hiring, over who works where, and again seek to divide and weaken the membership through favoritism fed by so-called wage incentives. The arbitration award settling the 1934 strike created jointly operated hiring halls in which union-elected dispatchers distributed the work. Workers eligible for dispatch were on a joint 'registration list." Yet the employers retained their right to have "steady gangs" whose

members, chosen directly by the employer, did not get their jobs through the hall, but each day reported to work wherever the employer directed.

After a succession of union grievances the steady gangs were eliminated by an arbitrator's award in 1939. This award by Wayne Morse opened the way for a new era of union and worker control of the workplace and strengthened the ILWU's steadfast view that democratic unionism required equalization of earnings among its members through equal access to work under a hiring hall system that rotated work opportunity fairly among all the members. According to the 1934 arbitration award, employers could participate in setting the rules by which the hall was run. They could also process any defined grievance procedure. But they could not by-pass the hall and the hiring of union members. Nor could they interfere with the day-to day operations carried out by the dispatchers, who were union members elected by the rank and file. The coastwise longshore contract governing the Pacific Coast hiring hall gave union members preference work in hiring.

In 1947 the waterfront employers made an all-out assault on the hiring hall using the provisions of the new anti-union Taft-Hartley law. Trying to exploit anti-labor and anti-radical sentiments of the time, the employers sought to dismantle the hall and throw out Harry Bridges the as the ILWU's President.

A bitter strike was waged in 1948, and the union's solidarity and ILWU support compelled the employers to back off and the hiring hall was preserved. Experience has shown that where and when the hiring hall is weakened the union is weakened. The hiring system determines relationships on the job, between workers as well as between worker and employer.

\*       \*       \*       \*       \*

Centralized hiring provides skilled and competent workers on an as-needed basis throughout the peaks and valleys of maritime schedules without the cost of maintaining a steady workforce, makes possible the orderly allocation of the workforce within and between ports and allows for the rational promotion of members according to seniority after equitable recruitment and training. Today, the refrain from the PMA is to "regain control of their work force." Fifty years ago, when the employers

> set out to smash the ILWU, to displace its democratically elected leadership, and to dismantle the hiring hall, they said they "only want to control hiring." The employers have the same objective today. In 1999 longshore negotiations the ILWU will have to be prepared to wage the same fight with the same solidarity and unity of purpose that in 1934 laid the cornerstone of our unmatched wages and conditions: the hiring hall.

The statements in the 1999 ILWU article on the hiring hall are all true and correct statements of the facts reported.

15.  Since the 1999 publication of the above ILWU article, the PCL&CA was re-negotiated in 1999, 2002, 2008, 2014, and 2019.  In all five sets of bargaining, the PMA Employers attempted to negotiate curtailment of the longshore and marine clerk dispatch halls, not just as a cost-saving measure but to weaken ILWU power.  The PMA Employers' attacks on the dispatch hall were beaten back only by the ILWU's conviction that the preservation of the coastwise bargaining unit, the coastwise agreement and the solidarity of the union workers stand or fall on the preservation of the dispatch halls, overseen on a daily basis by the ILWU and the workers that make up the ILWU.

## **Current Administration of The Dispatch Halls**

16.  At all material times through the present, the longshore industry dispatch halls have been located and administered in each port, including in the State of California.  Under the collective bargaining agreement, workers are not hired at or by the dispatch hall.  Rather, the dispatch hall notifies the worker as to the availability of specific jobs under the PCL&CA from work orders placed by the various PMA Employers, which those workers can pick or obtain.  Jobs commence when the worker reports for duty at one of the Defendant PMA Employers' terminals.  The PMA Employers do not have any control over workers when they are in the hall or when they travel from the hall to the waterfront jobsites.

17. Dispatch practices vary widely from port to port. The local JPLRCs for each port and, where applicable, for the longshore and marine clerk JPLRCs can and have negotiated different dispatch practices in local port working and dispatch rules. For example, in my home port of Los Angeles/Long Beach, we have different sets of dispatch rules for registered longshore workers and for casuals. I further understand that marine clerks are dispatched according to an entirely different set of dispatch rules in Los Angeles/Long Beach.

18. I am not aware of any dispatch hall, including the dispatch halls in the Los Angeles/Long Beach area, that maintains any records regarding (1) the amount of time any individual longshoreman or marine clerk spends at the dispatch hall, (2) whether or when a longshoremen or marine clerk "checked in" at the dispatch hall, or (3) did not pick up a job at the dispatch hall. There is no way to identify how much time any particular longshoreman or marine clerk spent at the dispatch hall or how often a longshoreman or marine clerk went to the dispatch hall to pick up a job, but did not receive one.

19. With the exception of steady longshoremen and marine clerks who work a set schedule for single PMA member company, casual and registered longshoremen and registered marine clerks do not work a set schedule or have any obligation to go to or call their dispatch hall on any particular day or at any particular time. Casual workers are not required to go to the dispatch hall on any particular day. Rather, the only requirements that these workers have are to meet minimum availability rules in order to qualify for benefits and maintain their registration. Casuals have different rules and requirements in each local port. For example, in Los Angeles/Long Beach, casuals are required to have worked once every six months. In all ports, casuals do not receive "credit" of any kind for checking in at the dispatch hall, but not receiving a job.

20. When workers are at the dispatch hall waiting to see if there are jobs available for the next shift, they are free to do what they want, including personal

and union business, so long as they do not violate their dispatch rules of conduct. For example, I have witnessed the following types of interactions take place at the Los Angeles/Long Beach longshore Dispatch Hall: politicians speaking to ILWU members, ILWU members distributing literature relating to internal union and outside political activity, ILWU members speaking to other members about internal union governance, memorial services for fallen workers, and regular socializing. I have also had opportunity to pick up jobs from other ILWU Dispatch Halls when visiting another port and to otherwise visit other ILWU Dispatch Halls through my duties as Coast Committeeman, and have observed similar activities taking place at other ILWU Dispatch Halls. When workers travel from the dispatch hall to the job site, they are not under the control of the PMA Employers. They are free to stop for food or drinks, run personal errands, and go to their homes. On many occasions, I have stopped for food and drinks and run personal errands on my way from the dispatch hall to the job site.

21. The terms and conditions for administration of the dispatch halls are set forth in the PCL&CA as well as in supplemental, regional and port agreements, which are negotiated by the local PMA representatives, local employers and ILWU locals. The current PCL&CA, effective by its terms through July 1, 2022, contains various provisions regarding the maintenance of the "joint" registration/dispatch system, first mandated by the federal National Longshore Board. In particular, section 8.1 provides for the joint maintenance and operation by the ILWU and the PMA of longshore and clerk dispatching halls in each port covered by the Agreement, including all ports in California:

> 8.11 – The dispatching of all longshoremen shall be through halls maintained and operated jointly by the ILWU Longshore and Warehouse Union and the Pacific Maritime Association in accordance with the provisions of section 17. There shall be one central dispatching hall in each of the ports with such branch halls as shall be mutually agreed upon.

1 Section 17.12 of the PCL&CA lists as the first duty of the Joint Port Labor Relations Committee – "To maintain and operate the dispatching hall" under the "ultimate control of the Coast Labor Relations Committee."

22. Although longshore and clerk registration lists are maintained for each port, such registration is treated as "coastwise" under section 8.32 and other provisions of the PCL&CA in accordance with the coastwise bargaining unit itself. Pursuant to section 8.41, fully-registered Class "A" longshoremen are given first preference in dispatch to available jobs in their respective categories; limited-registered Class "B" longshoremen are given second preference, and unregistered or casual workers, including Identified Casuals, are dispatched only after all registered employees have been afforded an opportunity to work. Casuals are an auxiliary workforce, which supplements the fluctuating labor needs of the industry.

23. Class "A" and Class "B" registered longshoremen receive the full benefits of continuous, regular employment, including pension benefits, health care insurance, vacation and holiday pay. Registered workers are also covered by a Pay Guarantee Plan ("PGP") set forth in Section 20 of the PCLCD, which provides supplemental wage payments during periods of inadequate work opportunity or economic downturn in the industry.

24. Under the PCL&CA, Class "A" and "B" registered workers are entitled to a daily hours guarantee under certain circumstances. This guarantee is set out in Section 3.1 of the contract. It provides that fully- and limited-registered longshore workers are entitled to 8 hours of pay as soon as they are ordered to a job, report to work, and are "turned to." This means that as soon as fully-and limited-registered longshore workers begin work, they are automatically entitled to a full 8 hours' pay, regardless whether the job is concluded before 8 hours is up.

25. The PCL&CA establishes three shifts. As set forth in Section 2.4 of the collective bargaining agreement, the first (morning) shift starts at 8:00 a.m.,

11
DECLARATION OF FRANCISCO PONCE DE LEON, III
CASE NO. 2:19-CV-10421 GW(JCX)

Exhibit 1
Page 12

the second (evening) shift starts at 6:00 p.m., and the third ("hoot owl") shift starts at 2:30 or 3:00 a.m.

26. The PCL&CA includes provisions that permit – under certain limited circumstances – a longshore worker's shift to begin one hour before the three shift starts discussed above. These early starts are known in the industry as "flex starts." Sections 2.449 of the contract sets out the rules for "flex starts." As set out in that section of the contract, "flex starts" are permitted for dock operations. However, Section 2.4492 provides that if there is a "flex start," the employers must pay the longshore workers who start one hour early an additional hour of pay at the contractual overtime rate.

27. After September 9, 2011, the government started requiring workers at port facilities to have a TWIC Card, or Transportation Worker Identification Credential. Obtaining a TWIC requires an individual to go through a background check including a criminal records screen. ILWU has long opposed TWIC because we did not think it made the ports safer and because it would prohibit some represented longshore workers and marine clerks from being able to work because of their past history with the law or because of mistakes in government criminal record reports. In particular, ILWU has been concerned that the PMA Employers would use TWIC to their advantage to track workers for disciplinary or anti-union purposes. Therefore, the position of the ILWU has long been that whether a worker obtains a TWIC is between him or her and the government. We have successfully fought to keep the PMA Employers out of it in arbitration. Specifically, in July 22, 2009, Coast Arbitrator John Kagel issued this final and binding decision on all PMA Employers: (1) granting the ILWU's motion that, "The possession of a TWIC is not a condition of employment under the PCL&CA;" and (2) requiring PMA to "escort" any workers who do not have TWIC cards so that they can access the job sites or pay the workers lost work opportunity claims if they refuse to escort them. A true and correct copy of this

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TEL: (415) 771-6400 FAX: (415) 771-7010

arbitration decision is attached hereto as **Exhibit "B."** Since the issuance of this decision, ILWU and its locals have successfully obtained lost work opportunity payments for represented employees who did not have a TWIC card and for whom PMA failed to provide an escort so that they could work at the job site.

I certify and declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 19th day of November, 2020, at San Francisco, California.

_____
Francisco Ponce De Leon, III

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TEL: (415) 771-6400 FAX: (415) 771-7010

13
DECLARATION OF FRANCISCO PONCE DE LEON, III
CASE NO. 2:19-CV-10421 GW(JCx)

Exhibit 1
Page 14